UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

SHERWIN BIRKETT,

               Defendant.

-----------------------------------------------x

**MEMORANDUM**
Case No. 90-CR-1063-24

*Appearances*

*For the United States:*
BREON PEACE
United States Attorney
By: Andrew D. Reich
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

*For the Defendant:*
ROYCE RUSSELL
R-SQUARE, ESQ. PLLC
112 West 34th St., 18th Fl.
New York, NY 10120

**BLOCK, Senior District Judge:**

    Sherwin Birkett ("Birkett") is serving a life sentence for his role in a drug

distribution ring called the Vassell Organization, also known as the McGregor

Gulley Posse (the "Organization"). In furtherance of his work in the ring, Birkett

participated in two murders.[1] He has served approximately 32 years in prison since

---

[1] The Presentence Report indicates that "Harold Spence, a rival crack dealer was
murdered by Birkett and codefendant Paul Moore in Dallas, Texas" and "John

he was 19 years old, and he is now 52. Before the Court is Birkett's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). For the following reasons, the Court grants his motion and reduces his life sentence to 40 years.

## I.     BACKGROUND

Birkett arrived in New York at age nine from his native Barbados to reconnect with his mother who had migrated to the United States two years prior in search of work. During the two years Birkett lived in Barbados without his mother, he stayed with extended family members. He had no contact with his father since he was one year old. During that time, he was abused at school and began skipping classes. Shortly after his arrival in New York, Birkett connected with older men in the neighborhood who were apparently members of the Vassell Organization. It was not long until he began distributing drugs on their behalf to earn money. Soon, the Organization came to supplant Birkett's family unit.

At 14, Birkett dropped out of school and was sent to Dallas, Texas by his elders in the Organization where he was "cared for by affiliated members" and

---

Wilson was shot and killed in Dallas, Texas by Birkett and his cousin Michael Butcher." December 16, 1991 Presentence Report, *United States v. Birkett*, No. 90-CR-1063 SJ (E.D.N.Y. Dec. 16, 1991) ¶ 59. Very little detail is provided about either murder. Spence was shot several times, suggesting that Birkett and Moore both fired at him, but no information is provided about the circumstances of Wilson's murder to clarify whether Birkett, his cousin, or both acted as the triggerman in that killing.

provided with "food, clothes and shelter."[2] Def.'s Pro Se Mot. to Reduce Sentence at 5-6. He was also paid $500 weekly to distribute crack cocaine to street dealers. *See id*. at 6. The distribution of drugs goes hand-in-hand with violence, and Birkett was then exposed to both. Birkett writes that he was "numb to the affects [sic] of what drug use. . . and what gun violence did to individual families & communities." *Id*. His contribution to the violence epidemic began with carrying a pocketknife as a youth and ended with murder when he was just barely a legal adult. *See id*. From the age of 17 until his arrest two years later, Birkett was an enforcer for the Organization. This role included exacting revenge on rival narcotics distributors on behalf of higher-ups in the Organization, including Eric Vassell, one of Birkett's co-defendants and the leader of the Organization.

On April 7, 1989, when Birkett was 18 years old, he and co-defendant Paul Moore ("Moore") shot and killed rival drug dealer Harold Spence.[3] Spence was found dead in an alley in Dallas, Texas, his body collapsed against a barbed wire fence after having been shot several times, with a pistol in his hand. On June 3, 1990, Birkett and a co-conspirator killed John Wilson in an apartment in Dallas.[4]

---

[2] The government does not oppose the personal accounts relayed in Birkett's pro se motion.

[3] According to the Presentence Report, Spence "was shot multiple times in the face, chest, back stomach and arms by posse members Paul Moore and Sherwin Birkett." *Id*. at ¶ 54.

[4] See n.1 *supra*.

3

In November of that year, Birkett was arrested and charged, together with 45 co-defendants, with offenses stemming from his role in the Vassell Organization.

After a jury trial, Birkett was found guilty on August 22, 1991, of two counts: one count of racketeering, with the predicate acts of murder and conspiracy to distribute narcotics, and one count of conspiracy to distribute narcotics. On July 28, 1992, Judge Reena Raggi sentenced Birkett to two concurrent life sentences. He unsuccessfully appealed to the Second Circuit, *see United States v. Vassell*, Nos. 92–1296, 92–1444, 92–1445, 92–1446, 92–1702 (2nd Cir. May 13, 1993), and his subsequent habeas petition was denied by this Court in 2008, *see Birkett v. United States*, No. 97-CV-1526 DGT, 2008 WL 1902231 (E.D.N.Y. Apr. 28, 2008). Birkett then moved for re-sentencing following amendments to the U.S. Sentencing Guidelines, which the Court denied in 2009.[5] *See Birkett v. United States*, No. 90-CR-1063 SJ, 2009 WL 10655836 (E.D.N.Y. June 1, 2009).

On May 31, 2022, Birkett filed a pro se motion for compassionate release in accordance with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ("First Step Act"). The Court subsequently appointed counsel under the Criminal

---

[5] At oral argument, which was held on June 21, 2023, the government relied on the Court's 2009 denial in support of its opposition to the instant motion. However, that motion—made prior to the enactment of the First Step Act—was based on technical changes to the Sentencing Guidelines, which Birkett's appointed counsel at the time conceded did not apply to Birkett's case.

Justice Act, and Birkett's counsel filed supplemental briefing in support of

Birkett's motion. The government filed papers in total opposition.

## II.    COMPASSIONATE RELEASE

As the Court has previously explained, whether a defendant is entitled to

compassionate release under the First Step Act requires a three-part analysis. *See*

*United States v. Russo* --F. Supp. 3d --, at *1-2 (E.D.N.Y. Nov. 28, 2022). First, a

defendant must satisfy an administrative burden by applying to the warden of the

defendant's facility for compassionate release. Then, the Bureau of Prisons

("BOP") may bring a motion in the appropriate district court on the defendant's

behalf, or, if 30 days have passed and the BOP has not filed the motion, the

defendant may file the motion directly in the district court. *See id*. The parties

agree that Birkett has satisfied his administrative burden.

As explained in the Second Circuit's comprehensive discussion of the

history of the statute in *United States v. Brooker,* the power to effect the reduction

of a prison sentence was previously the sole province of the BOP. 976 F.3d 228,

231 (2d Cir. 2020). That is because prior to the enactment of the First Step Act,

only the BOP Director could make a compassionate release motion on behalf of a

defendant under § 3582(c)(1)(A), the so-called compassionate release statute. After

such a motion was brought, this statute empowered district courts to modify a

previously imposed sentence if they found that extraordinary and compelling

reasons existed and the applicable sentencing factors warranted a reduction:

> [T]he court . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

Although this statute has been in place since 1984 when it was enacted as part of the Comprehensive Crime Control Act, *see* Pub. L. No. 98-473, 98 Stat. 1837, 1998-1999, section 603(b)[6] of the First Step Act marked a sea change in the role of the sentencing judge. Now, defendants may apply directly to the district court on their own behalf; therefore, they need not rely on the BOP to do so. Thus, the district judge may revisit a previously imposed sentence and reduce it—even grant the defendant's freedom—if warranted under applicable standards. But the challenge now facing the re-sentencing judge is to identify and apply these standards.

In *Brooker*, the circuit court addressed the standards. 976 F. 3d at 232-38. It explained that their origins stemmed from the enactment of 28 U.S.C. § 994(a)(2) in 1984 when Congress directed the Sentencing Commission to promulgate "general policy statements regarding application of the guidelines or any other

---

[6] Notably, section 603(b) is titled "Increasing the Use and Transparency of Compassionate Release."

aspect of sentencing." 28 U.S.C. § 994(a)(2)(c). In 2006 the Sentencing Commission identified the "extraordinary and compelling" reasons that would warrant a sentence reduction in Application Notes to Guideline § 1B1.13. U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 1B1.13 Application Notes (U.S. Sent'g Comm'n 2006). As explained in *Brooker*, such reasons existed if "'the defendant [was] suffering from a terminal illness,' from significant decline related to the aging process that would make him unable to care for himself within a prison, or upon 'the death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.'" 976 F.3d at 232 (quoting U.S.S.G. § 1B1.13 n.1(A)(i)-(iii)).

But these guidelines "also introduced what has come to be known as the catch-all clause: compassionate release is warranted if, '[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the other parts of the Guideline].'" *Id.* (quoting U.S.S.G. § 1B1.13 n.1(A)(iv)) (alterations in original). Notably, this language was contained in an Application Note, not in the Guidelines themselves.

As *Brooker* further explains:

By 2018, when the latest amendment to section 1B1.13 was made, the Sentencing Commission had expanded its own definition of extraordinary and compelling circumstances more broadly to cover

7

events relating to the traditional categories, and to clarify that such
circumstances did not have to be unforeseen at the time of sentencing.
But . . .it had maintained, nearly word-for-word, the catch-all
provision allowing for other unidentified extraordinary and
compelling reasons 'as determined by the Director of the Bureau of
Prisons.'

*Brooker*, 976 F.3d at 232-33 (quoting U.S.S.G. § 1B1.13 n.1(D)).[7]

The First Step Act did not change the catch-all clause. And *Brooker* only instructs

that district courts have "broad" discretion in determining what constitutes

extraordinary and compelling circumstances. *Id.* at 237.

In April of this year, the Sentencing Commission published proposed

amendments to the U.S. Sentencing Guidelines, including to section 1B1.13. *See*

U.S. Sent'g Comm'n, *Amendments to the Sentencing Guidelines (Preliminary)*

(April 5, 2023). These amendments would move the description of permissible

bases for granting a reduction, including the catch-all clause, from the Application

Notes into the body of the Guidelines. The amendments would also confirm that

rehabilitation alone cannot suffice as an extraordinary and compelling reason,

---

[7] Section 1B1.13, mirroring 18 U.S.C. § 3582(c)(1)(A)(i), states that

the court may reduce a term of imprisonment . . . if, after considering
the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are
applicable, the court determines that – extraordinary and compelling
reasons warrant the reduction; or the defendant is at least 70 years old;
and has served at least 30 years in prison . . .; the defendant is not a
danger to the safety of any other person or to the community . . .; and
the reduction is consistent with this policy statement.

8

though it may be considered in combination with other factors. Barring any preclusive action by Congress, the proposed amendments will become effective as of November 1, 2023. Though they are not yet in place, the Court may nonetheless consider them. *See United States v. Myers*, 854 F.3d 341, (6th Cir. 2017) ("precedents allow consideration of a pending Guidelines amendment") (internal quotation and citation omitted).

Still, these amendments would not add further guidance as to what may serve as extraordinary and compelling reasons. The district courts thus remain without more specific statutory or Sentencing Commission guidance as to the application of the nebulous catch-all clause. Therefore, without the benefit of such guidance, the task of the district judge remains to determine what other "extraordinary and compelling" reasons may be considered under the clause.

A body of judicial caselaw is evolving in this regard, and this decision adds to that caselaw in these uncharted waters.

## III.   ANALYSIS

Birkett posits a number of factors to support his motion, principally his age at the time he committed his crimes of conviction combined with his efforts at rehabilitation. He also asserts that he no longer poses a danger to the public.

### a. Birkett's Age

A district court may consider a defendant's age at the time of the offense conduct as an extraordinary and compelling reason. *United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021); *see also United States v. Rengifo*, 569 F. Supp. 3d 180, 193-94 (S.D.N.Y. Oct. 29, 2021); *United States v. Lara*, --F. Supp. 3d--, 2023 WL 2305938 at *8-9 (D.R.I. March 1, 2023); *United States v. Golding*, No. 05-CR-538, 2022 WL 2985014, at *2 (S.D.N.Y. July 27, 2022); *United States v. Morris*; No. 99-CR-267-17, 2022 WL 3703201, at *8 (D. Conn. Aug. 26, 2022). The life of the defendant in *Ramsay*, the seminal case on age as an extraordinary and compelling reason, parallels Birkett's in several ways.

At the time that Ramsay committed the offense that formed the basis of his RICO conviction, a double homicide, he was an 18-year-old young man who had immigrated to New York with his mother at age ten. He grew up without a relationship with his father, was bullied at school, and around the age of 12, he began hanging out with gang-affiliated men in his neighborhood who "made him feel safe and socially accepted." *Ramsay*, 538 F. Supp. 3d at 411. Shortly thereafter, he began selling drugs on their behalf. *Id*. At age 18, Ramsay shot and killed two innocent bystanders, one of whom was pregnant, at a block party during a failed attempt to assassinate a rival gang member. *Id*. at 411-12. At the time of

Ramsay's sentencing, the court described the facts and circumstances of the case as

"extreme . . . in terms of the awfulness of what Mr. Ramsay did." *Id*. at 413.

In granting his motion for compassionate release, Judge Rakoff identified

four attributes of youth that merit consideration: immaturity, susceptibility,

salvageability, and dependence. The Court finds Judge Rakoff's elaborate and

well-documented analysis compelling. First, with regard to immaturity, *Ramsay*

relied on both peer-reviewed studies and common sense in concluding that "in

high-pressure, time-sensitive, emotional contexts ('hot cognition'), adolescents

tend to make riskier decisions. Thus, when sentencing adolescent offenders—

particularly when the offense occurred quickly in a high-paced, emotional

environment, courts should bear in mind the adolescent 'maturity gap.'" *Id*. at 419-

20.

Second, courts should consider youthful susceptibility to peer pressure.

Thus, "courts, when sentencing adolescent offenders and particularly when the

criminal act took place in the presence of peers, should keep in mind adolescents'

temporarily enhanced susceptibility to peer influence." *Id*. at 422. Third, courts

should consider salvageability, or "the chance that [a defendant's] youthful

'character deficiencies will be reformed.'" *Id*. (quoting *Graham v. Florida*, 560

U.S. 48, 68 (2010)).

Finally, the sentencing court should consider an adolescent defendant's dependence on others. As the Supreme Court has explained, "relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment." *Id*. Thus, sentencing judges should inquire "whether the human being they are about to sentence is still in many respects an adolescent." *Id*. at 423.

All these adolescent attributes are relevant factors because they require consideration of the history and characteristics of the defendant and imposition of a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a). Therefore, a defendant's youth correlates to the potential for rehabilitation. *Id*. at 423 (quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005)) (A life sentence "is therefore rarely appropriate for adolescent offenders because 'juveniles still struggle to define their identity[,] [so] it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.'").

Birkett's age at the time of the offense conduct is highly relevant to the Court's assessment of whether he is entitled to a sentence reduction. While his drug trafficking activity may not necessarily have been a product of "hot cognition," it was certainly reflective of his immaturity, susceptibility, and dependence. Birkett started dealing drugs at the age of nine. He was doing so

fulltime by the time he was 14. His work as an enforcer for the Vassell
Organization flowed directly from this wanton criminal activity. At ages 18 and
19, when he committed his heinous crimes, he had been dependent on others for
his survival for nearly his entire life. And most of those people were the worst
imaginable role models.

Having engaged in a lifestyle of crime, Birkett made many "cold cognition"
criminal decisions. The two murders in which Birkett participated contained both
hot and cold cognition facets—they were apparently ordered by higher ups, but the
circumstances of one of the killings suggested the occurrence of a hot pursuit with
a rival that was also armed. Birkett committed these murders with co-defendants,
at least one of whom was older than him. This, combined with the fact that he
committed these acts on behalf of superiors in the Vassell Organization, suggests
the strong influence of peer pressure.

The susceptibility and dependency attributes of youth in particular weigh
heavily toward finding that age is an extraordinary and compelling factor in
Birkett's case. The Vassell Organization replaced Birkett's family unit when he
was a young teenager. He was particularly vulnerable to its influence because of
his fractured family circumstances and the abuse he endured as a child. Upon his
arrival in New York, when he sought to "find Islanders [he] could socialize with,"
it gave him "a sense of being back home," but it unfortunately also placed him in

an environment where using and selling drugs was commonplace. Def.'s Pro Se Mot. to Reduce Sentence at 5. Thus, drug trafficking and gang violence were a large part of Birkett's adolescent world. As he states: "[i]n my previous state of mind I did not think that crack distribution was abnormal." *Id*. at 6. By the time Birkett was relocated by the Vassell Organization from New York to Texas at age 14, it was preordained that he was on the path that would ultimately place him behind bars for life. Birkett's age at the time of the offense conduct constitutes an extraordinary and compelling factor warranting reconsideration of his sentence.

### b. Birkett's Rehabilitation

Birkett argues that his rehabilitation should weigh toward a finding of extraordinary and compelling circumstances. Again, rehabilitation alone cannot serve as an extraordinary and compelling circumstance. *See* 28 U.S.C. § 994(t). Nonetheless, a defendant's rehabilitation may be considered together with other factors. *Brooker*, 976 F.3d at 238; 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13 n.3.

While incarcerated, Birkett has earned his G.E.D. and completed several courses, as well as a non-residential drug program. Birkett's transition did not come overnight. He writes that it took him five years to rid himself of the "frozen" mindset he had with the Vassell Organization, *see* Def.'s Pro Se Mot. to Reduce Sentence at 6 ("It took the first five year's [sic] of my incarceration to thaw out emotionally from my frozen state of mind"), and he acknowledges the beneficial

14

transition he has undergone as a result of his imprisonment. As he puts it, "[i]ncarceration saved my life. It saved me from a violent culture of narcotic's [sic] distribution and gun violence." *Id*. at 7.

Birkett's incarceration has not been without incident. His record indicates several disciplinary violations, including possession of drugs in 1992, fighting with an inmate in 1997, refusing orders in 2004, and assaulting an inmate in 2010. His last infraction, which occurred in 2014, was for "failing to stand." Gov't's Opp'n to Def.'s Mot. for Compassionate Release, Ex. B at 1. But for the past nine years, Birkett's record has been clean, and his last serious infraction occurred thirteen years ago.

"As previously noted, Congress has identified rehabilitation as one of the rationales of criminal sentencing; a sentence of life imprisonment negates that rationale." *Ramsay*, 538 F. Supp. 3d at 425. This is especially true of young defendants receiving life sentences: "[t]heir own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven" *Roper*, 543 U.S. at 570; "as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson v. Texas*, 509 U.S. 350, 368 (1993). This means that younger defendants have greater hope of being rehabilitated and need not necessarily be incapacitated for the remainder of their lives to protect the public.

Such is Birkett's case. He has not had a serious infraction in over a decade and has acknowledged the rehabilitative value of his sentence. He was imprisoned for his abject criminal behavior when he was 19; he now is 52 years old. He has matured and shown clear signs that his incarceration has had rehabilitative value. Not only is rehabilitation one of the goals of sentencing *ab initio*, but it is within the province—and the responsibility—of the district judge to assess the nature and extent of rehabilitation during incarceration in deciding whether a prisoner should be given a second chance to live a law-abiding life. *See Brooker*, 976 F.3d at 237-38 (The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason (quoting 28 U.S.C. § 994(t)) (alterations in original)).

### c. Incarceration During COVID-19 Pandemic

Birkett correctly points out that during the COVID-19 pandemic, the punitive nature of incarceration became more intense. Indeed, inmates endured repeated lockdowns and quarantines, harsh restrictions on visitors, telephone use, and interaction with other inmates. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) ("federal prisons . . . have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal."). Because the pandemic has abated and these restrictions

impacted virtually every inmate incarcerated during the pandemic, the weight of this circumstance in the extraordinary and compelling analysis is diminished; however, it still weighs slightly toward a reduction. *See id*. ("It might seem, however, that this first factor [of COVID-19] . . . would diminish in importance once the pandemic was over. But this is not entirely so. For . . . aside from posing a threat to Rodriguez's health, [the pandemic] has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case.")

### d. Mandatory Nature of Sentence

Birkett also contends that the mandatory nature of his sentence should constitute an extraordinary and compelling circumstance. At the time that Birkett's sentence was imposed, the U.S. Sentencing Guidelines were mandatory and dictated a sentence of life. The mandatory nature of the Guidelines subsequently was declared by the Supreme Court to be unconstitutional. *See United States v. Booker*, 543 U.S. 220 (2005). Although *Booker* was not made retroactive, *Guzman v. United States*, 404 F.3d 139, 144 (2d Cir. 2005), this Court, as well as others, has held that the abrogation of a mandatory sentencing regime is a significant factor in the extraordinary and compelling analysis. *See Russo*, --F. Supp. 3d--, at *6 ("This circumstance alone probably can be considered extraordinary and compelling to support the Court's 'broad discretion.' But, in any event, it certainly can be considered a factor in combination with the other prevalent factors.");

*Ramsay*, 538 F. Supp 3d 427 ("[E]ven when constitutional, such mandatory

minimum sentences will often themselves be an extraordinary and compelling

reason warranting a sentence reduction, to the extent consistent with § 3553(a).");

*United States v. Parker*, 461 F. Supp. 3d 966, 981 (C.D. Cal. 2020); *United*

*States v. Stanback*, 377 F. Supp. 3d 618, 625 (W.D. Va. 2019). As succinctly stated

in *Ramsay*: "the fact that the Court was precluded from 'tak[ing] into account the

circumstances of the offense together with the character and propensities of the

offender,' *Com. of Pa. ex re. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937), including

Ramsay's youth, was in obvious conflict with the Court's usual duty to ensure that

punishments are 'no greater than necessary' to satisfy the purposes of criminal

sentencing." 538 F. Supp. 3d 427.

### e. Sentencing Disparity

Finally, the Court must avoid sentencing disparities "among defendants with

similar records who have been found guilty of similar conduct." 18 U.S.C.

§ 3553(a)(6). Although this sentencing factor "was intended to eliminate national

disparity," it "does not on its face restrict the kinds of disparity a court may

consider." *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007).

Birkett and co-defendant Moore were the only two defendants from the

Vassell Organization's 46-defendant takedown to proceed to trial, and the only two

to receive life sentences. All the other defendants plead guilty, have served their

sentences, and have been released from prison. The Court granted Moore's motion for a reduced sentence under 18 U.S.C. § 3582(c)(1)(A) in November 2022 and he has since been released.

The longest sentence imposed for any of the other co-defendants was 33 years. This includes the leader of the Organization, Eric Vassell, who murdered two people and ordered the killing of several others. Vassell was released in December 2022 after serving a 25-year sentence. Several other co-defendants have also served sentences for conduct including murder. As the Court explained when it granted Moore's motion, co-defendants of Birkett and Moore "who accepted plea deals received significantly lighter sentences, despite engaging in similarly violent conduct." *United States v. Moore*, --F. Supp. 3d --, at *10 (E.D.N.Y. Nov. 28, 2022). Two co-defendants, for example, received only ten-year sentences for conduct that included first-degree murder, and another received a sentence of twenty years for  conduct that also included murder. *See id*.

Although defendants should be given credit for acceptance of responsibility, extreme sentence disparity among co-defendants resulting from their choice to go to trial can be an extraordinary and compelling factor warranting a sentence reduction. *See United States v. Ballard*, 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021) (holding that a gross sentencing disparity between co-defendants resulting partially from the defendant exercising his constitutional right to trial when his co-defendant

19

accepted a plea deal supported a finding of extraordinary and compelling circumstances); *see also United States v. Haynes*, 465 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (finding that the severity of one defendant's sentence as compared to his co-defendant's was an extraordinary and compelling circumstance when the harsher sentence resulted from the defendant's decision to decline a plea deal and proceed to trial). Because the sentencing disparity between Birkett and his co-defendants results primarily from his choice to exercise his right to trial rather than from a difference in offense conduct or other sentencing factors, the Court finds that the disparity, as it did with Moore, weighs toward a finding of extraordinary and compelling circumstances.[8]

### f. Section 3553(a) Factors

In addition to avoiding sentencing disparities, the section 3553(a) factors that district courts must consider in deciding a motion for compassionate release are the same as those considered at every sentencing: (i) the nature and circumstances of the offense; (ii) the history and characteristics of the defendant; (iii) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (iv) the need to adequately deter criminal conduct; (v) the need to protect the public from the defendant; (vi)

---

[8] Of course, this comparison does not include co-defendant Moore, who also proceeded to trial and received a life sentence.

the need to provide the defendant with necessary rehabilitation; and (vii) the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

Birkett's crimes were horrific. With the help of his co-defendants, Birkett took the lives of two men. The circumstances of the slayings suggest that they were assassinations at the behest of other members of the Vassell Organization. Birkett also conspired with his co-defendants to traffic narcotics with no apparent regard for its human consequences.

The section 3553(a) factors require examination of these serious offenses alongside consideration of Birkett's history and characteristics. As explained, Birkett was an immature, susceptible young man of 18 and 19 years of age at the time that he committed these crimes. He had known only a life of drug trafficking and its concomitant violence since he was nine years old. And his clean disciplinary record for the past decade reflects that the need to protect the public from him has dissipated. *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, https://www.ussc.gov/sites/default/files/pdf /research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last visited June 26, 2023) (finding that "Older offenders [are] substantially less likely than younger offenders to recidivate following release."); *United States v. Piggott*, No. 94-CR-417, 2022 WL 118632, at *3 (S.D.N.Y. Jan.

12, 2020) ("It is also well-established that recidivism decreases significantly with age.").

Moreover, Birkett faces deportation subsequent to his incarceration. Courts have held that this may be considered when balancing the § 3553(a) factors. *See United States v. Johnson*, 245 F. Supp. 3d 393, 397 (E.D.N.Y. 2017) (collecting cases); *United States v. Francis*, No. 06 CR 80, 2021 WL 242461, at *2 (S.D.N.Y. Jan. 22, 2021) (finding that the defendant "will not pose a danger to any persons or to the community" because he was to be removed upon release).

Accordingly, after carefully considering all the applicable extraordinary and compelling factors and balancing the 3553(a) factors, the Court reduces Birkett's imprisonment to 40 years.

## CONCLUSION

Birkett's motion is **GRANTED**. His sentence is reduced to 40 years or 480 months on Count One and 15 years or 180 months on Count Four, to run concurrently, followed by a term of five years of supervised release. The General Conditions of supervised release will be imposed.

**SO ORDERED.**

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 29, 2023